## STATE v. HICKS.

(Filed June 10, 1902.)

1. EXCEPTIONS AND OBJECTIONS—*Assignment of Error—Appeal.*

An exception to the charge as given will not be considered by supreme court.

2. EVIDENCE—*Homicide.*

There is sufficient evidence in this case to sustain the charge of murder.

3 INSTRUCTIONS.

The trial judge is not required to give instructions in the very words in which they are asked.

4. INSTRUCTIONS.

It is not error to refuse a charge, however correct in law, which there is no evidence to support.

INDICTMENT against Plummer Hicks, heard by Judge *E. W. Timberlake* and a jury, at Fall Term, 1901, of the Superior Court of VANCE County.

Grant Hall, a witness for the State testified: "I am a carpenter and live at Kittrell's, about half a mile from where Robert Crudup was shot; heard gun on night of shooting at quarter to nine o'clock. It was Sunday night, June 30, 1901. Soon after hearing gun I went to Moses Link's and found Robert Crudup dead. It was about half an hour after shooting. Crudup was spare made, about seventeen years old and well grown. The body was lying on the porch and seemed to have been shot from his stomach up to his neck; badly about throat. Shot were about No. 6 or 8, I think. They were small shot, not bullets. Report was that of a gun. Gun shots in the porch on the railing about two and one-half feet, other shot in posts entering into porch, other shot in railing on inside porch. There was another shot nine or ten feet

high on porch, evidently from another fire of the gun.  Street runs down from Kittrell's past this place, and is thirty feet wide.  This is the last of six houses in a row.  The shot came from beyond the lower corner of the yard diagonally.  Little patch of pines, I think, in front of the house, higher than the house, about seventy-five yards from the house.  Between pines and house there is a cluster of trees, across street from house, as far as length of court-house, about sixty feet.  The house is about ten or twelve feet from street.  House 16 by 16, with ell or small room behind.  Porch 8 by 12 feet.  It was a bright moonshining night, about the full of the moon."

Cross-examination, he said:  "Pines diagonally off from house, more nearly opposite lower corner of yard.  Four or five trees in cluster.  Examined no tracks.  Don't suppose I could have done so.  Mr. Williams and myself looked out and saw some tracks on other side the street, the direction from which the shot came, but there were others, and we could not tell about them.  Up street Dilly Williams lives in next house, about sixty-five feet away; Widow Eaton in next, about same distance apart.  Well is a little beyond second house, from Link's and towards Kittrell's."

Oscar Link testified:  "I am son of Moses Link.  Was not at home at time of shooting.  Had been to church, and was at well in the street above our house at the time.  I saw who shot Robert Crudup.  It was Plummer Hicks.  I was at the well and saw him slipping along in the little oaks in front of our house.  He was going towards street.  Had gun; went down a little above the edge of the street, and I saw him shoot the first time.  The last time he shot he was running.  He had no coat, but a white shirt; no hat.  It was light out doors.  The moon was shining.  I hollered, 'It was nobody but Plummer Hicks.'  I ran to house and found that Robert Crudup had been shot.  He was not dead when I got there, but died in about fifteen minutes.  I know Plummer Hicks

well.  Had known him seven years.  He married my sister, who was then up stairs in the house.  There was a window from which he could have seen.  Plummer Hicks said he was going to kill mamma; said this soon after Jennie, his wife, left him.  It was this year.  I had seen him about the branch and pines back of our house after sister left him.  I went before Coroner and Justice of Peace and told them what I saw and knew."

Cross-examined:  "I was at well when I saw Plummer Hicks.  He was one hundred yards from me.  He was stooping, slipping through the bushes about half bent.  Bushes were in old field where there were high weeds.  He was in low bushes.  He was right in front of house when I first saw him.  He was a little other side of street from the house, and a little the other side of the house.  He was about as far as door of jury-room (about thirty feet) below corner of yard.  He was on opposite side of street and facing house.  He was nearer to corner than any other part of yard.  Frightened me when he was shot.  He was standing straight up.  I ran after last shot.  I saw the gun he had.  It was double-barrelled.  I got to house first and before Grant Hall got there.  Body was on floor of cook-room.  Nobody was with me at well.  I was hollowing to no one when I said, 'It is nobody but Plummer Hicks.'  He said he was going to kill mamma and some of the rest of them and he didn't care what was done with him.  It was about 9 o'clock at night.  Plummer was standing a little way off out of street when he shot and ran."

Louisa Link testified:  "I am mother of Oscar Link and Jennie, wife of defendant.  She left him after Easter Monday and came to my house.  Plummer said to me, 'You've got Jennie now and you'd better keep her.  That if she went back he'd kill her, and me, too, if I darkened his door.'  Threatened her life and mine several times.  She never

lived with him again. I was at home the night Robert Crudup was shot and was lying in bed asleep when I heard gun. It was a light night. I saw Robert run by me and fall, when he died. He didn't say anything. My bed was near the front door. He was carried out in the porch that night. Oscar, my son, ran in at once after the shooting, and said, 'You all hush hollowing. It was nobody but Plummer Hicks. I saw him and know him.' I saw Plummer Hicks around here often after my daughter left him, in the pines back of our house."

Cross-examined: "Second gun fired as he ran past me. Mary came in soon after Robert was shot. (Not long after Robert passed me before I heard the next shot fired.) Mary was right behind Robert. It was a bright moonlight night. Oscar said as soon as he came in, 'Hush hollowing; its nobody but Plummer Hicks. Yonder he goes; he went running down the path.' "

Mary Link testified: "Know night Robert was shot. I was at home sitting with him in porch. My back was to street and his face to street. Robert was shot. I saw Plummer Hicks just before Robert was shot, and then again after he was shot. The first time he was up above street, front of door. It was not long after this till Robert was shot. Robert jumped up and ran in house. So did I. Second time he shot he was running. He was bareheaded and did not have on any coat. I told them all in the house that it was Plummer Hicks who shot Robert."

Cross-examined: "I am fifteen years old. Crudup was sitting at end of porch with his back sorter turned to the rail and his face in direction where I saw Plummer Hicks. We had been out there a very short time. I had not been anywhere at all. When I first saw Plummer he was in front of house above the street, standing straight. I did— (Witness here, by request of counsel, described how she saw him, by a

deliberate turn of the head to the rear, and without pause, im-
mediately returning to front view.)    That was all I saw of
him till Robert was shot.    He was as far from me to Mr.
Hicks from the street (about 15 or 18 feet).    Robert was
facing the direction from which the shot came.    When shot,
Robert jumped and ran in room as quick as he could, and I
right behind him.    I was in room when he fell.    My face was
turned towards Robert when he was shot.    I looked around
as we ran and saw it was Plummer Hicks.    I was going in
door when second shot fired; the shots were close together.
Plummer was standing diagonally from house when he shot,
opposite or below corner of yard.    He was in field.    Don't
know whether he had a single or double-barrelled gun.    It
was too small to see at night.    Had plain cotton shirt, en-
tirely white, no stripes or checks in it.    Didn't have on no
gallusses, that I saw."

This was the whole of the State's testimony.    The defend-
ant offered no testimony.

From a verdict of guilty of murder in the first degree, the
defendant appealed.

*Robert D. Gilmer,* Attorney-General, for the State.
No counsel for the defendant.

COOK, J.    The prisoner was tried upon a bill of indict-
ment for murder and convicted of murder in the first degree.
No evidence was offered on his behalf, nor was there any ex-
ception to that introduced by the State.    The exception
taken, upon which the appeal is based, is to the refusal of the
Court to give, first, the special instructions prayed for, and,
second, "to the charge as given."    The second is a broadside
exception and not entitled to be considered under the rules
and decisions of this Court.    *State v. McDuffie,* 107 N. C.,
885, and numerous other cases.    But as a human life is at

stake we have carefully perused the charge of his Honor as given to the jury and find it to be without fault. The instructions prayed for were substantially given by the Court, except such parts thereof as were not supported by any evidence, and to charge that "upon the whole testimony it is the duty of the jury to render a verdict of not guilty," and in so refusing there was no error. There was abundant evidence to sustain the charge in the bill of indictment. The Judge is not required to give instructions in the very words in which they are asked, and when the charge substantially embraces the proper instructions prayed for, it is no ground for a new trial. *State v. Anderson,* 92 N. C., 732; *State v. Brewer,* 98 N. C., 607; *State v. Massey,* 65 N. C., 480; *State v. Neville,* 51 N. C., 423; *State v. Brantley,* 63 N. C., 518; *State v. Booker,* 123 N. C., on page 725, and other cases there cited.

All of the material and proper parts of the instructions asked to be given by the counsel of prisoner appear to have been fully and explicitly given. In the charge his Honor made no allusion to the "bias of hostile witnesses," nor to the degree of scrutiny to be given to the evidence of such witnesses, as contended for in the prayer for instructions, and he refused to charge that it would be murder in the second degree only if the prisoner "saw deceased in company with a woman whom he supposed to be his wife, who had deserted him and become angered thereby, and in a sudden fury slew deceased." In failing and refusing to so charge, we see no error, for the record contains no evidence to show that the witnesses were biased, or that the prisoner supposed that the deceased, Robert Crudup, was in company with a woman whom he supposed to be his wife. While it is possible, and, from the circumstances of the homicide as testified to, may be probable that prisoner supposed such to be the fact, yet there is no evidence to support such a contention; and it is held in

*State v. McDuffie, supra,* that it is "not error to refuse a charge, however correct in law, which there was no evidence to support." The burden of the proof was to identify the prisoner as being the man who slew the deceased. No excuse or evidence in mitigation, or evidence of any kind, was offered on behalf of prisoner, nor was such shown from the evidence of the State.

There is No Error.